The HARTFORD STEAM BOILER INSPECTION AND INSURANCE COMPANY, Plaintiff–Appellee,

v.

QUANTUM CHEMICAL CORPORATION, Defendant–Appellant.

No. 92–2075.

United States Court of Appeals, Seventh Circuit.

Argued June 10, 1992.

Decided June 30, 1992.

---

**1.** The Honorable Kenneth F. Ripple, did not participate in the consideration of the suggestion for rehearing en banc.

Susan Getzendanner (argued), Kimberley K. Baer, and John A. Bannon, Skadden, Arps, Slate, Meagher & Flom, Chicago, Ill.; Thomas W. Mochnick, Hartford Steam Boiler Inspection & Ins. Co.; and F. Timothy McNamara, Hartford, Conn., for plaintiff-appellee.

Eugene A. Schoon, Robert A. Downing (argued) and Gerard D. Kelly, Sidley & Austin, Chicago, Ill., for defendant-appellant.

Before POSNER, COFFEY, and EASTERBROOK, Circuit Judges.

EASTERBROOK, Circuit Judge.

A heat exchanger failed catastrophically. The ensuing fire destroyed an ethylene processing plant. Quantum Chemical Corporation, which operated the plant in Morris, Illinois, sustained losses that it believes exceed $150 million. The Hartford Steam Boiler Inspection and Insurance Co. insured Quantum against losses attributable to most failures of its heat exchangers, but not explosions. Industrial Risk Insurers and DR Insurance Company, Quantum's commercial property insurers, wrote policies covering explosive failures. Limits on these policies exceed Quantum's claims. So it ought not matter to Quantum whether the failure at Morris was an "explosion." But it matters to the insurers. Hartford concluded that the heat exchanger exploded. It denied coverage. The other insurers concluded that the heat exchanger did not explode. Both denied coverage. Convenient findings for their shareholders, disastrous findings for Quantum. (Actually the property insurers have paid Quantum some $20 million, but each insurer contends that another is responsible for business losses attributable to the fire.)

Mutually exclusive policies create a possibility that all insurers will deny coverage, and litigation is not a sure answer—for unless all parties can be haled into the same forum, inconsistent decisions may leave the insured without compensation even though the sole thing on which the insurers agree is that the policies collectively cover the losses. As it turns out, lack of complete diversity of citizenship prevents resolution of this dispute in a single federal case. Cf. *Foster McGaw Hospital v. Building Material Chauffeurs Welfare Fund*, 925 F.2d 1023 (7th Cir.1991), suggesting that Congress authorize inverse interpleader to resolve such contests.

■ People need not depend on the legislature to provide a forum; they may designate their own by agreeing to arbitration. Hartford did so by Endorsement 15 to its policy. This provides that if insurers disagree about which policy covers a loss:

> We [Hartford] shall, upon written request from you [Quantum], pay to you one-half of the amount of the loss which is in disagreement, but in no event more than we would have paid if there had been no commercial property coverage part in effect, subject to the following conditions: ...
>
> (2) The commerical [sic] property insurer(s) shall simultaneously pay to you one-half of the amount which is in disagreement:
>
> (3) The payments by us and the commercial property insurer(s) hereunder and acceptance of those sums by you signify the agreement of us and the commerical [sic] property insurer(s) to submit to and proceed with arbitration within 90 days of such payments....
>
> (4) You agree to cooperate in connection with such arbitration but not to intervene therin [sic]:
>
> (5) The provisions of this endorsment [sic] shall not apply unless such other coverage parts issued by the commercial property insurer(s) is [sic] similarly endorsed: and

(6) Acceptance by you of any payment pursuant to the provisions of this endorsement, including an arbitration award, shall not operate to alter, waive, surrender or in any way effect [sic] the rights you have against us or the commercial property insurer(s).

After denying coverage, Hartford filed this suit under the diversity jurisdiction, seeking a declaratory judgment that it owes nothing. Quantum asked the court to direct Hartford to arbitrate; Hartford accurately replied that, although courts may enforce contractual promises to arbitrate, they may not send disputes to arbitrators just because that is a good idea. Endorsement 15 commits Hartford to pay and arbitrate, but only if the other carriers are bound too. Neither Industrial Risk Insurers nor DR Insurance had such a rider before Quantum demanded arbitration.

In January 1992, more than two years after the disaster of September 1989, Quantum's other insurers issued endorsements identical to Hartford's Endorsement 15. Once again, Quantum asked the district court to compel arbitration. Hartford opposed this demand, contending that the belated endorsements created an option to choose between litigation and arbitration, a valuable choice that Quantum and the other insurers would not have possessed if the other policies had these endorsements at the outset. At oral argument in late April the district court agreed:

> [Quantum's position] puts Hartford at the mercy of the other carriers as far as whether there should be arbitration or not. The other carriers can, in the time after a loss has occurred, carefully analyze the pros and cons of arbitration and make a decision based upon the specifics of the particular loss as to whether they will or will not agree to arbitrate. Whereas, on Quantum's analysis, Hartford had cast the die long before the loss when it issued its own endorsement. Because that kind of lack of parallelism strikes me as inequitable, it does not strike me as a reasonable interpretation of the rights granted by Endorsement 15.

The court declined to order Hartford to arbitrate and stayed further proceedings pending Quantum's appeal under 9 U.S.C. § 16(a)(1)(B). We accelerated the briefing and heard oral argument six weeks after the district judge's decision.

Quantum's brief harps on the theme that it is entitled to be compensated for its loss, leaving the carriers to fight among themselves. It wraps up: "[T]he decision of the District Court should be reversed and an appropriate order should be entered directing Hartford Steam Boiler to advance Quantum half of the disputed loss and to proceed to arbitration". If what Quantum wants is money, we lack jurisdiction. The Arbitration Act authorizes interlocutory appeals from orders refusing to compel arbitration. Orders refusing to direct the payment of money are appealable, if at all, by partial judgment under Fed.R.Civ.P. 54(b), and then only if the court has finally disposed of a complete claim. *Liberty Mutual Insurance Co. v. Wetzel*, 424 U.S. 737, 96 S.Ct. 1202, 47 L.Ed.2d 435 (1976); *Horn v. Transcon Lines, Inc.*, 898 F.2d 589 (7th Cir.1990).

A reading of Endorsement 15 shows that although Hartford promises to pay half of certain disputed amounts, it does not promise to arbitrate anything with Quantum. The insured is entitled to cash; then Hartford is entitled to arbitrate with other carriers. Quantum is not only a stranger to this arbitration but also forbidden to intervene. Paragraph 6 adds that the decision in the arbitration does not bind Quantum in any way. So if, for example, the insurers advanced less than the sum Quantum believed was due, it could sue for the rest—which the insurers presumably would share in the percentages fixed by the arbitrator. Neither a party to any arbitration nor fettered by its outcome, Quantum is the wrong entity to seek arbitration. That right belongs to Hartford, as a third-party beneficiary to the other endorsements required by ¶ 5.

We learned at oral argument, however, that Quantum never asked the district judge to order Hartford to pay a dime. Instead Quantum persistently asked the

district court to direct Hartford to arbitrate with the other two insurers, which are not parties to the litigation. Although an order denying such a request is appealable under § 16, the outcome is foredoomed. Suppose Hartford had never issued Endorsement 15 and Quantum had asked the district court to invent a new federal common law of arbitration, under which insurers must arbitrate unless their policies *disclaim* that form of dispute resolution. A rejection of that request would be appealable as an order "denying a petition under section 4 of this title to order arbitration to proceed," § 16(a)(1)(B), but summary affirmance would be appropriate. Just so here. Quantum has no contractual right to arbitrate anything with anyone; it has a claim to money, which when paid gives Hartford a right to arbitrate with the other carriers.

Our decision that Quantum is not entitled to relief does not end the appeal. Hartford wants sanctions. In seeking to persuade us to expedite the appeal, Quantum accused Hartford of dragging its heels in paying $55 million in "undisputed" losses. Time has passed, to be sure, but Quantum did not file its formal proofs of claim until October 1991, after which Hartford promptly began this suit. Quantum did not inform us that the other two insurers' endorsements were added in January 1992, so that this litigation has moved quickly indeed. And Quantum's loss is "undisputed" only in the sense that Hartford, in denying all responsibility, did not dispute any particular number Quantum proposed. Literal truth can mislead by selective omission, and Quantum's papers teem with half-truths.

Sanctions under Fed.R.App.P. 38 or 46(c) do not follow automatically from misleading documents, however; we must decide whether a penalty is appropriate. *Mars Steel Corp. v. Continental Bank N.A.*, 880 F.2d 928, 938 (7th Cir.1989) (in banc); *Colosi v. Electri–Flex Co.*, 965 F.2d 500, 504–505 (7th Cir.1992). Hartford, too, tries to put the best face on things in saying that no part of Quantum's loss is conceded. Endorsement 15 supposes that the insurer will estimate the loss even if it denies responsibility; half of nothing is not worth much. Moreover, for all the difficulty Quantum encounters in obtaining speedy appellate resolution, it has a strong claim to payment while the insurers wrangle. Hartford promised to pay if other insurers also pay and arbitrate. They are so bound. True, their promises came late. But delay did not create an option to choose between arbitration and litigation according to its estimates of success. Quantum, at least, had that privilege all along, even if the other insurers had made promises identical to Endorsement 15 at the instant they underwrote the risk.

Recall that Endorsement 15 allows the insured to decide whether to make the demand for half payment. If it calls for immediate payment, arbitration ensues; otherwise the insurers must litigate the allocation among themselves, and by ¶ 6 Quantum reserves its right to litigate. Having issued an endorsement under which its insured had an arbitrate-or-litigate option, indeed an arbitrate-*and*-litigate option, from the start, Hartford cannot readily contend that the other firms' belated agreements put it at a disadvantage. Although the other insurers might have estimated the benefits of litigation versus arbitration after the fact, the choice to make the demand (and precipitate arbitration) belongs to the insured rather than the other carriers. Quantum's lawyers blundered by not asking the district court to direct half payment, blundered again in misreading Endorsement 15 as giving Quantum (rather than Hartford) a right to arbitrate, and blundered a third time in exaggerating matters in an effort to get prompt attention, but the circumstances do not call for adding injury to the loss already borne.

AFFIRMED.